**F I L E D**

PUBLISH

**July 25, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BENNIE MAESTAS; RAY HORT,

    Plaintiffs-Appellants,

v.

DAVID A. SEGURA; DENNIS PRATT,
in their individual capacities; CITY OF
ALBUQUERQUE; MARTIN CHAVEZ,
Mayor of Albuquerque,

    Defendants-Appellees.

No. 04-2028

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV-02-1052-JP/RLP)**

Kent Winchester, Albuquerque, New Mexico, for Plaintiffs-Appellants.

Robert M. White, City Attorney, and Paula I. Forney, Assistant City Attorney,
Albuquerque, New Mexico, for Defendants-Appellees.

Before **KELLY**, **BALDOCK**, and **BRISCOE**, Circuit Judges.[*]

---

    [*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

**BALDOCK**, Circuit Judge.

_____

Plaintiffs Bennie Maestas and Ray Hort are employees of the City of Albuquerque's Solid Waste Management Department (SWMD). They sued Defendants David Segura and Dennis Pratt under 42 U.S.C. § 1983.[1] Plaintiffs alleged Defendants retaliated against them in violation of the First Amendment after Plaintiffs spoke out on waste and inefficiency within the Vehicle Maintenance Division (VMD) of SWMD. The district court granted Defendants summary judgment and Plaintiffs appealed. We exercise jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment de novo and affirm, albeit on different grounds.[2] See Young v. United States, 394 F.3d 858, 861 (10th Cir. 2005).

_____

[1] Plaintiffs also named Mayor Martin Chavez and the City of Albuquerque as defendants in their complaint. In their opening brief, Plaintiffs expressly state they are not appealing the district court's grant of summary judgment in favor of Chavez. Furthermore, Plaintiffs briefs are devoid of any issue statement relating to municipal liability or argument as to why municipal liability is appropriate in this instance. See Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 777 (10th Cir. 2004) (explaining that unraised issues and undeveloped arguments on appeal are waived). In any event, Plaintiffs' claims against the City necessarily fail because we hold Plaintiffs failed to present sufficient evidence to establish a constitutional violation against either Defendant. See Triglet v. City of Tulsa, 239 F.3d 1150, 1154-56 (10th Cir. 2001) (§ 1983 requires a predicate constitutional violation to support municipal liability).

[2] Although Defendants couched their motion for summary judgment in terms of qualified immunity, the district court ultimately applied the traditional summary judgment standard in granting Defendants' motion. We too apply that standard to resolve this appeal against them. See Petersen v. Farnsworth, 371 F.3d 1219, 1224 (10th Cir. 2004) (declining to consider defendants' entitlement to qualified immunity where no constitutional violation occurred).

2

I.

Plaintiff Maestas began working for the City of Albuquerque in 1989. In 1994, Maestas became "materials manager" at VMD. VMD, a division of SWMD, is responsible for maintenance, repair, and operation of the City's fleet of refuse trucks and equipment. SWMD is responsible for developing the specifications for VMD's refuse trucks and equipment. In 1997 Maestas formally complained about a tire shredder's failure to meet bid specifications. Maestas informed an internal auditor for the City, Rick Williams, and the local newspaper, the Albuquerque Journal, that SWMD substantially overpaid for the defective shredder. Maestas also complained in 1998 to Defendant Pratt, superintendent of VMD, about SWMD buying overpriced and defective refuse trucks that required costly repairs and did not meet bid specifications. Frustrated with Pratt's apparent indifference, Maestas never again complained to Pratt.

Maestas did, however, continue to complain about waste and inefficiency at VMD to Williams, city councilors, and the media. Maestas' complaints did not fall on deaf ears. An internal audit into SWMD's purchase of the tire shredder, refuse trucks, and replacement parts revealed numerous problems requiring corrective action. A 1999 audit report revealed SWMD purchased refuse trucks from a single vendor between 1995 and 1999 that did not meet bid specifications. "Follow-ups" to the audit report continued to uncover problems. Following his transfer to SWMD's Central Service Division (CSD) in April 2002, Maestas continued to complain about waste and inefficiency at VMD.

Plaintiff Hort began working for the City as a mechanic in 1986.  Hort began voicing complaints shortly after he became "permanent."  The City promoted Hort to "solid waste supervisor" sometime in the mid 1990s.  Hort worked at various times in the tire shop, the parts room, and as a floor foreman overseeing mechanics.  In 1996, Hort complained to Pratt about the high cost of hydraulic parts.  Hort acknowledged he did not know the terms of VMD's parts contract, but complained because Maestas told him the parts cost too much.  Hort also complained to the assistant superintendent at VMD, Frank Ortega, about problems with front-loader refuse trucks.  In 1998, Hort complained about unsafe tires that did not meet bid specifications.  Like Maestas, Hort had little contact with Pratt.  Instead, Hort complained to intermediate managers, Williams, and city councilors.  Hort also raised issues of overcharges to SWMD's senior buyer.  Hort remained a VMD supervisor until his transfer to SWMD's Clean City Division (CCD) in April 2002.

Sometime between 1997 and 2000, Pratt called a meeting with Maestas and Hort to discuss certain internal memos.[3]  The memos addressed problems with the recapping of tires.  Pratt suspected the two men sent the memos to internal auditors and "leaked" them to a local television news station.  Maestas and Hort denied the

---

[3] Plaintiffs and Defendants in their respective depositions had difficulty providing specific and consistent time frames for the occurrence of critical events.  We view the facts in the light most favorable to Plaintiffs.  See Howlett v. Birkdale Shipping Co., 512 U.S. 92, 94 (1994).

accusations.  After further investigation, Pratt called a second meeting with Maestas and Hort:  "I again confronted them with . . . them saying they never sent them.  'I need you guys to let me know if you are going to be doing this sort of stuff because I can't stop anyone from doing it, but at least you could let me know.'"  Pratt subsequently held a meeting with all VMD supervisors/managers and asked them to follow the chain of command:  "'Let's keep this stuff in-house.  If we can't handle it, you don't think I'm handling it, go to the director, work your way up through the chain of command."

Several months later, in December 2001, Martin Chavez became the City's newly elected mayor.  Chavez appointed Defendant Segura as acting director of SWMD on the first day of the new administration.  Chavez's first priority as mayor was cutting costs and reducing debt.  The mayor promptly "asked every director to come up with a 10% budget cut across the board."  Segura, in turn, directed SWMD division heads, including Pratt, "to look at programs or positions" to cut.  In January 2002, Chavez requested another city-wide 10% budget cut.  Segura directed his division heads "to cut deeper" and "look at personnel."

Consistent with Segura's instructions, Pratt considered possible personnel cuts.  Because Segura had changed SWMD work shifts from ten hours to eight hours and eliminated the Saturday shift, Pratt concluded he could eliminate four supervisory/managerial positions.  Pratt proposed to eliminate the positions of materials manager, assistant fleet manager, and two supervisors, which would save VMD $300,000.

5

Pratt proposed to retain three supervisory/managerial positions at VMD–one for the day shift, one for the night shift, and one for outlying locations. Pratt submitted his proposal to Segura in early 2002. Pratt's submission ended his role in the 2003 fiscal year budget process. Segura accepted Pratt's proposal and included the personnel cuts in his 2003 budget recommendation to the Chavez administration. Segura made the final decision to "defund" or "deappropriate" the four positions. He did not recall specifically discussing either Maestas or Hort with Pratt during his decisional process.

Williams informed Maestas and Hort in late December 2001, or early January 2002, about possible layoffs. In late January 2002, Maestas and Hort delivered letters, written by Williams, to the City's human resources department, district attorney, city attorney, chief administrative officer, and Segura. Both men complained they were experiencing a hostile work environment in retaliation for raising concerns about the misuse of public funds at VMD. Maestas and Hort asserted unnamed SWMD management personnel informed them they would be disciplined for speaking out; however, they later acknowledged neither Segura nor Pratt threatened them with disciplinary action. Rather, Plaintiffs claimed they heard about the threats from "various employees" within SWMD.[4]

---

[4] In the district court, Maestas asserted Tito Montoya, an SWMD employee, told Maestas he overhead a conversation in which Mayor Chavez told Segura "f _ _ _ those two individuals. I have enough votes on the City Council to get rid of them." Maestas assumed the mayor was referring to himself and Hort. Montoya, however, testified he

(continued...)

In early April 2002, the City's human resources department informed Maestas of the proposal to eliminate his position at VMD. The memo emphasized it was not a layoff notice and no such notice would be given "unless and until" the proposed deappropriation became part of the final 2003 budget. Because of Hort's seniority, he did not receive a notice despite the proposal to eliminate his supervisory position at VMD. Maestas submitted a letter to the city council on the day of its budget meeting. Therein, Maestas referred to SWMD as "Solid Waste Enron." Maestas informed the council that he persistently complained about SWMD's wasteful unreported spending for over six years. Maestas objected to his proposed layoff as "blatant retaliation" by "our supervisor and director." At the council meeting, Maestas personally voiced concern for his and Hort's jobs. He asked the council to delay voting on the proposed deappropriation until the release of further audit reports. The city council voted to place funding for three of the four positions proposed for deletion back into SWMD's general budget fund. The council did not earmark the funding for any particular positions within SWMD. The council voted to defund one supervisory position which was vacant at the time of the meeting.

---

[4](...continued)
never overhead the alleged conversation, and never told Maestas about any such conversation. Segura stated he did not have any conversation with Chavez about Maestas or Hort. Because Plaintiffs do not pursue their retaliation claim against Chavez on appeal, this factual dispute is immaterial. See supra n.1.

The next day, Pratt asked Segura whether the three positions would remain in VMD. Segura suggested that because VMD no longer needed the positions, he might utilize the funding elsewhere within SWMD. Segura and Pratt had previously identified the work of the materials manager as duplicative of other work performed in VMD. Based upon an audit report that identified a problem in CSD with inventory control of refuse carts and bins, Segura reassigned Maestas to CSD. Maestas retained the same salary, benefits, and job title. No one replaced Maestas as materials manager at VMD. Due to shift restructuring, Segura and Pratt also concluded they could eliminate a supervisor's position at VMD. Hort acknowledged he had the least seniority of VMD's three day supervisors. Based upon Chavez's call for reduced graffiti response time, Segura reassigned Hort to supervise the graffiti response crew in CCD. Hort too retained the same salary, benefits, and job title. The day shift supervisor at VMD assumed Hort's former duties.

## II.

Plaintiffs Maestas and Hort argue Defendants Segura and Pratt retaliated against them for speaking out on matters of public concern in violation of the First Amendment. Applying the familiar four part test to determine whether a public employer has violated an employer's right to free speech, the district court first concluded the evidence was sufficient for a reasonable jury to find Plaintiffs' speech was a substantial motivating factor in Defendants' decision to transfer Plaintiffs out of VMD–transfers which,

8

according to the district court, constituted adverse employment actions. Nevertheless, the court ultimately concluded Defendants would have reached the same decision absent Plaintiffs' speech. Because we conclude no reasonable jury could find Plaintiffs' speech was a substantial motivating factor in Defendants' decision to transfer them out of VMD, our inquiry ends there.

A.

A government employer may not, as a condition of employment, compel an employee to relinquish carte blanche his First Amendment right to comment on matters of public concern. See Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). Such employer, however, is not constrained from altering an employee's conditions of employment for legitimate reasons. To prevail on a claim of retaliation in the free speech context, the employee must establish (1) the speech involved a matter of public concern, (2) the employee's interest in engaging in the speech outweighed the employer's interest in regulating the speech, and (3) the speech was a "substantial motivating factor" behind the employer's decision to take an adverse employment action against the employee. See Baca v. Sklar, 398 F.3d 1210, 1218-19 (10th Cir. 2005); see also Mount Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977) (equating "substantial" factor with "motivating" factor). If the employee establishes these three factors, he wins unless (4) the employer establishes it would have taken the same action in the absence of the protected speech. Baca, 398 F.3d at 1219; see also Ballard v. Muskogee Reg'l

9

Med. Ctr., 238 F.3d 1250, 1252 (10th Cir. 2001) (noting the trio of Supreme Court cases which fashioned the four part test). The first two factors present questions of law. The latter two factors address causation and present questions of fact subject to the preponderance of the evidence standard. See Baca, 398 F.3d at 1219.

Defendants in this case concede the first two factors. Under the third factor, the employee has the initial burden of establishing causation–that is, to show the exercise of constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment.[5] What constitutes a substantial motivating factor evades precise definition. An employee "need not prove his speech was the sole reason for defendants' action." Copp v. Unified

---

[5] The employee also bears the burden under the third factor of establishing an adverse employment action. See Vanderhurst v. Colorado Mountain College Dist., 208 F.3d 908, 914 n.1 (10th Cir. 2000). The circuits are split as to what may constitute adverse employment action in the context of a First Amendment claim. Compare Spiegla v. Hull, 371 F.3d 928, 941 (7th Cir. 2004) (any action that is likely to deter the exercise of free speech is adverse) with Stavropoulos v. Firestone, 361 F.3d 610, 619-20 (11th Cir. 2004) (action must tend to chill free speech and alter some important condition of employment to be adverse). We have repeatedly stated that some forms of retaliation may be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII. See Baca, 398 F.3d at 1220; Wells v. Colorado Dept. of Transp., 325 F.3d 1205, 1220 (10th Cir. 2003). In Schuler v. City of Boulder, 189 F.3d 1304, 1309 (10th Cir. 1999), we recognized that retaliation involving "promotion, transfer, recall after layoff, and hiring decisions" may be actionable under the First Amendment "although not amounting to termination of employment or the substantial equivalent of dismissal." That is as far as we have gone. Unlike the Seventh Circuit, we have never held employment action which may tend to chill free speech is necessarily adverse. See Baca, 398 F.3d at 1220. Given our conclusion that Plaintiffs' speech was not a substantial motivating factor for their respective transfers within SWMD, we continue to leave that question for another day.

10

Sch. Dist. No. 501, 882 F.2d 1547, 1554 (10th Cir. 1989). Nor is the employee required to show "but-for" causation; that is, to demonstrate but-for the employee's speech the subsequent employment action would not have occurred. See Spiegla v. Hull, 371 F.3d 928, 941-43 (7th Cir. 2004). Rather, the employee must show the protected speech *played a substantial part* in the employer's decision to adversely alter the employee's conditions of employment. See Anderer v. Jones, 385 F.3d 1043, 1052 n.14 (7th Cir. 2004); Quinn v. Monroe County, 330 F.3d 1320, 1329 n.10 (11th Cir. 2003); Ostad v. Oregon Health Sciences Univ., 327 F.3d 876, 885 (9th Cir. 2003); Davis v. Goord, 320 F.3d 346, 354 (2d Cir. 2003); Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000).[6]

To withstand summary judgment at step three, therefore, an employee must produce evidence linking the employer's action to the employee's speech. See Ramirez v. Oklahoma Dept. of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994), overruled in part on other grounds, Ellis v. University of Kansas Med. Ctr., 163 F.3d

---

[6] In Hasan v. United States Dept. of Labor, 400 F.3d 1001 (7th Cir. 2005), the Seventh Circuit sought "to clarify the requirements of proving causation in a retaliation case." Id. at 1005. Hasan provided three instances where a plaintiff claiming retaliation based on the exercise of free speech could establish a prima facie case of causation. The third instance was where "[t]he improper reason may have been present to the defendant's mind as something favoring the action he took, but have weighed so lightly in comparison with other factors that it exerted no influence at all on his decision." Id. at 1006. We disagree that such a showing is sufficient to shift the burden to an employer to show it would have reached the same decision despite the improper factor. See Mt. Healthy, 429 U.S. at 287. Where an improper factor exerts little or no influence on the employer's decision, such factor cannot be said to have played a *substantial* part in the employment decision.

11

1186, 1194-98 (10th Cir. 1999). Speculation or hunches amidst rumor and innuendo will not suffice. See Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003). Nor can a plaintiff sustain his burden at step three "simply by showing that the elimination of the protected activity may have been welcomed by the defendants[.]" Wright v. Illinois Dept. of Children & Family Servs., 40 F.3d 1492, 1500 (7th Cir. 1994) (internal quotations omitted); accord Collyer v. Darling, 98 F.3d 211, 229 (6th Cir. 1996).

Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive. See Baca, 398 F.3d at 1221. But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision. Id; see also Morfin v. City of East Chicago, 349 F.3d 989, 1005 (7th Cir. 2003) (explaining protected conduct cannot be a basis for retaliation where defendants did not know of such conduct). An employer's knowledge of the protected speech, together with *close* temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment. See Ramirez, 41 F.3d at 596. Other evidence of causation may include evidence the employer expressed opposition to the employee's speech, see Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 929 (9th Cir. 2004), or evidence the speech implicated the employer in serious misconduct or wrongdoing. See Baca, 398 F.3d at 1221. On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, see McGuire v. City of Springfield, 280 F.3d 794, 796

12

(7th Cir. 2002), or evidence of intervening events, see Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998), tend to undermine any inference of retaliatory motive and weaken the causal link.

B.

In this case, Plaintiffs Maestas and Hort have failed to present sufficient evidence linking their speech to Defendant Segura's decision to transfer them within SWMD. Segura became acting director of SWMD in December 2001. By that time, Maestas and Hort had been voicing concern about the misuse of public funds at VMD for over four years. Nothing in the record indicates, however, Segura knew of Plaintiffs' complaints when, in the early days of the new administration, he received Mayor Chavez's first, and then second, directive to cut SWMD's budget. Segura's undisputed testimony was that he never received a personnel briefing upon his arrival at SWMD.

Consistent with Chavez's second call for city-wide budget cuts, Segura in early January 2002 informed all SWMD division heads, including Pratt, that deeper cuts were required and they should look more closely at personnel. Segura did not become aware of VMD's fiscal problems until Councilman Greg Payne subsequently provided him with a copy of the audit report. Still, nothing in the record suggests Segura knew, at that point, Plaintiffs' complaints spawned the report. Rather, Segura became aware of Plaintiffs' involvement in late January 2002 when he received their respective letters complaining about a hostile work environment at SWMD. The letters, however, failed to identify

13

any specific instances of hostility as a result of Plaintiffs' "whistle-blowing" activities or allege any personal involvement on the part of Segura or Pratt.

Segura never suggested to Pratt or anyone else at SWMD that he wanted to target Plaintiffs for layoff. In fact, Defendants never spoke to each other specifically about Plaintiffs. Segura properly delegated the task of determining where personnel cuts might be made at VMD to Pratt. Segura adopted Pratt's proposal to eliminate the position of VMD materials manager because he could not justify maintaining the position.[7] He adopted Pratt's proposal to eliminate two supervisor positions from VMD because shift restructuring made those positions expendable.

That the city council refused to defund Plaintiffs' positions amidst their assertions of unlawful retaliation against Segura and Pratt is understandable. Today, threats of legal action routinely hinder the operations of public institutions and hamper government officials' ability to reach sensible decisions based upon legitimate criteria. Plaintiffs' successful pleas to the council notwithstanding, nothing in the record suggests Segura

---

[7] Segura explained his decision to accept Pratt's proposal to eliminate VMD's materials manager position:

Well, I had gone through the divisions, and I went through Vehicle Maintenance Division, and I felt that . . . it was too top heavy, that we needed to get rid of the[] [positions]. There was too much duplication especially in the purchasing side, because we had . . . Jaramillo. He did all the purchasing for my department, and I had . . . Sedillo, who was the parts manager and his staff. I couldn't justify materials manager in that position of Vehicle Maintenance.

14

possessed an improper motive when he transferred Plaintiffs to new positions within SWMD, where they remained under his direction. Segura's decision to transfer Plaintiffs out of positions for which SWMD no longer had any need and into newly-created positions for which SWMD had a demonstrated need made good business sense. In sum, Plaintiffs presented insufficient evidence for a reasonable jury to conclude that an improper motive played a substantial part in Segura's decision to transfer them into their current positions.[8]

As the Supreme Court succinctly explained in Rutan v. Republican Party, 497 U.S. 62, 76 (1990), "[t]he First Amendment is not a tenure provision," and does not protect public employees from legitimate government action. Our role is not to second-guess Segura's decision to transfer Plaintiffs to new positions within SWMD. Our role is to determine whether Plaintiffs have presented evidence such that a jury reasonably might find a substantial motivating factor in that decision was Plaintiffs' protected speech. We hold they have not.[9]

---

[8] Segura never had any direct encounter with Hort regarding Hort's speech. Segura's only direct encounter with Maestas regarding Maestas' speech occurred in March 2002 *after* Segura submitted his personnel proposal to the administration. Segura had seen Maestas' name quoted in a newspaper article regarding the misuse of funds at SWMD. We think it entirely unremarkable that Segura, as director of SWMD, would ask Maestas, his subordinate, why Maestas had not brought his concerns directly to the director. That Segura may have been displeased with Maestas at that point is not itself evidence of retaliation. See Wright, 40 F.3d at 1500.

[9] In addition to Plaintiffs' free speech claims, they also raised political affiliation claims in the district court. Plaintiffs now appear to have abandoned those

(continued...)

15

C.

We similarly hold Plaintiffs have failed to present evidence sufficient to establish a causal link between their protected speech, Defendant Pratt's personnel recommendation, and Segura's ultimate decision to transfer Plaintiffs out of VMD. While Segura made the final decision to transfer Plaintiffs, Pratt, though a subordinate, might be liable if he possessed a retaliatory motive which set in motion the events that ultimately led to Plaintiffs' transfers. See Gilbrook v. City of Westminster, 177 F.3d 839, 855 (9th Cir. 1999) (holding a subordinate fire chief who initiated an investigation into *and* recommended the discharge of firefighters liable for violating the firefighters' free speech rights); Darnell v. Ford, 903 F.2d 556, 561-62 (8th Cir. 1990) (holding a subordinate patrol major who investigated the conduct of *and* recommended the demotion of a captain liable for violating the captain's associational rights); Professional Assoc.

---

[9](...continued)
claims as evidenced by their failure to seriously address them in their briefs or pursue any claim against Mayor Chavez on appeal. See supra n.1. While the record indicates Plaintiffs openly supported a candidate other than Chavez in the 2001 mayoral election, the record contains absolutely *no* evidence the proposal to eliminate Plaintiffs' positions or their ultimate transfers out of VMD were politically motivated. Maestas identified several SWMD employees who had supported candidates other than Chavez without consequence. Hort stated he did not have any evidence his transfer was politically motivated. Instead, he had "just a feeling." The only evidence Hort could muster was that an unidentified person told city employees Sam Garcia and Frank Castillo, who in turn told city employee Frank Ortega, who in turn told Hort, that Hort had better support Chavez. Such triple hearsay would not be admissible at trial; nor is it admissible on summary judgment. See Adams v. American Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).

16

of College Educators v. El Paso County Cmty. College Dist., 730 F.2d 258, 266-67

(5th Cir. 1984) (holding a subordinate college president who instigated charges against

*and* recommended the discharge of a college administrator liable for violating the

administrator's associational rights).

In this case, Pratt did *not* set in motion the chain of events which ultimately led

to Plaintiffs' transfers.  Plaintiffs had been complaining for over four years about

the mishandling of public funds at VMD without repercussion.  See McGuire, 280 F.3d

at 796 (noting that a "long wait" often implies no causation because supervisors seeking

to retaliate likely do so at an earlier stage; delay makes intervening causes more likely).

Plaintiffs had not complained directly to Pratt in over two years.  While asking Plaintiffs

to follow the chain of command at one point, Pratt acknowledged he could not do

anything to stop Plaintiffs from complaining.

Several months later, Chavez was elected mayor.  Thus began the intervening

events leading to Plaintiffs' transfers.  Chavez's demand for city-wide budget cuts

prompted Segura to instruct Pratt (and other division heads) to look into cutting

personnel.[10]  Only then did Pratt, consistent with his director's instructions, recommend

the deappropriation of four positions at VMD, two of which Plaintiffs occupied.

---

[10]  The personnel action included in SWMD's proposed 2003 budget was
part of a larger plan.  According to Anna Lamberson, city budget officer:  "The new
administration proposed as a solution to the financial problems the deletion of a total
of 165 filled and 103 vacant positions citywide, as well as freezing 249 vacancies.
Each department identified filled and vacant positions to be deleted."

17

Pratt was notably silent prior to receiving his instructions and after delivering his proposal. He did absolutely nothing to suggest he was targeting Plaintiffs because of their prior speech. In fact, Pratt stated that once he submitted his proposal to Segura: "That was it for me." After the city council declined to defund the positions, Pratt returned to Segura for direction. The record indicates Segura, not Pratt, raised the idea of transferring Plaintiffs to positions with demonstrated need outside VMD, but within SWMD. We cannot ignore these legitimate intervening events that led to Pratt's personnel proposal and his subsequent decision to seek guidance from Segura. See Gubitosi, 154 F.3d at 33.

Plaintiffs' First Amendment claims against Pratt are superficially appealing. After all, Pratt and VMD were Plaintiffs' target of persistent attack over a course of years–perhaps justifiably so. Pratt may have welcomed Plaintiffs' departure from VMD. But a plaintiff alleging retaliation "does not meet his burden . . . simply by showing that elimination of the protected activity may have been welcomed by the defendants." O'Connor v. Chicago Transit Auth., 985 F.3d 1362, 1369 (7th Cir. 1993). Such a showing is insufficient to establish Plaintiffs' speech as a substantial motivating factor in Defendants' employment decision. A public employee, by engaging in constitutionally protected speech, ought not be able to prevent his supervisor from assessing employment needs and making decisions on the basis of those needs "simply because the protected conduct makes the [supervisor] more certain of

18

the correctness of [his] decision."  Mt. Healthy, 429 U.S. at 286.


      AFFIRMED.

No. 04-2028, <u>Maestas v. Sugura</u>

**Briscoe, J.,** dissenting.

In my view, plaintiffs have presented sufficient material facts to withstand summary judgment on their First Amendment claims. That is, unlike the majority, my review of the record under the relevant summary judgment standards leads me to the conclusion that plaintiffs have produced sufficient evidence to establish their employer's adverse employment actions were in direct response to their prior protected speech. I therefore dissent.

We review the district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court. <u>Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F. 3d 1321, 1326 (10th Cir. 1999). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, we are to review the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. <u>Simms</u>, 165 F.3d at 1326. Further, in First Amendment cases, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." <u>Schalk v. Gallemore</u>, 906 F.2d 491, 494 (10th Cir. 1990) (internal quotation omitted).

Viewing the record in the light most favorable to the plaintiffs, the following chronology of events becomes evident. In December 2001, a local television news team appeared at SWMD to interview Pratt regarding information the news team had received from Maestas and Hort about mismanagement and governmental waste. The information consisted of a packet of internal memorandums between Pratt, Maestas, and Hort.

Pratt realized it was Maestas and Hort who provided this information to the media and, within a month, Pratt recommended the elimination of their positions. In the months following Pratt's recommendation, Maestas and Hort complained publicly about problems with SWMD and what they viewed as the retaliatory elimination of their positions. During this same period, Pratt and Segura continued to pursue the elimination of Maestas' and Hort's positions. Pratt and Segura eventually proposed a budget that removed funding for Maestas' and Hort's positions.

Maestas and Hort allege Pratt was also aware they were the persons who provided information to internal auditors regarding mismanagement of SWMD. As a result of the information Maestas and Hort provided, an internal auditor (Rick Williams) sent a series of letters to Pratt regarding the concerns raised by Maestas and Hort. Although Maestas acknowledges he was not directly threatened by Pratt or Segura for providing information to the City's internal auditors, he alleges that Pratt's threats were conveyed to him by Frank Ortega.

In response to audit inquiries from Williams in March of 2002, Maestas was called

2

into a meeting with another SWMD official and was told that Segura did not want Maestas to provide any additional information to internal audit. In March or April 2002, Segura spoke with and directly criticized Maestas, who was quoted in a newspaper story, for speaking to the media before talking to him about concerns with the department.

After learning their positions were being eliminated and they were in danger of being laid-off, Maestas and Hort communicated with members of the city council, city administrators, the district attorney's office, and by a letter sent to Segura in January 2002. In their January 25, 2002, letters and in Maestas' letter to the city council, Maestas and Hort raised the same concerns they had previously raised, i.e., serious mismanagement of SWMD, governmental waste, and retaliation against them for publicly raising these problems.

At a meeting of the city council on April 9, 2002, the council rejected the recommendations of Pratt and Segura to eliminate the plaintiffs' positions and instead re-appropriated funding for those positions. At this council meeting, Maestas described Pratt and Segura's activities as the "Solid Waste Enron." A week after the city council meeting, Pratt and Segura transferred Hort and Maestas to other jobs. On April 16, 2002, Maestas was removed from his job as vehicle maintenance materials manager and transferred to a previously non-existent unit where he would supervise the inventory of trash carts and bins. On April 16, 2002, Hort was transferred from his position as a supervisor of mechanics to a job as a supervisor of graffiti removal.

3

Defendants allege that plaintiffs' positions were eliminated due to budget cuts. Maestas and Hort contend, however, that budget cuts were not the reason behind the elimination of their positions. They cite the city's published budget (Exhibit P)[1] and note that the approved budget for 2002 SWMD did not decrease, but in fact increased by more than $1,500,000.00. The SWMD approved budget for 2003 also provided for a spending increase of an additional $1,500,000, rather than a budget cut. Although the estimated actual budget decreased between 2001 and 2002, the decrease in budget affected only the costs for operating, transfers, and grants. The budget for personnel costs was not reduced, but actually increased by almost $500,000 in 2002.

The district court found support for the defendants' budgetary reasons for

---

[1] The defendants argued in their reply brief to the trial court that Exhibit P, the city's published budget, was inadmissible and thus could not be considered for purposes of summary judgment. The district court agreed, deeming the exhibit inadmissible because it was unauthenticated and contained hearsay. The exhibit, however, should have been admitted in my view. The exhibit, which is part of the City's published budget that was produced by the government upon a discovery request by the plaintiffs, falls within a number of exceptions to the hearsay rule and is properly authenticated for purposes of summary judgment analysis. For example, the budget falls within the hearsay exception provided under Federal Rule of Evidence 803(8) for public records and reports. Also, the budget is authenticated as a document produced through a discovery request and as a self-authenticating official publication under Federal Rule of Evidence 902(5). In response to an argument that a letter written by an individual to Phil Donahue should not be considered in the court's summary judgment analysis because it was unsupported by a sworn affidavit, this court concluded that the letter was admissible because it was obtained through a request for the production of documents. Anderson v. Cramlet, 789 F.2d 840, 845 (10th Cir. 1986). Similarly, the City's budget should have been deemed authenticated as an official published document produced in response to a discovery request.

4

elimination of Maestas' and Hort's positions by concluding the 2002 fiscal year budget revealed a mid-year revenue shortfall. However, the budget in question specifically referenced other actions that were taken to address the shortfall, i.e. recycling was to be picked up every other week, as opposed to every week, and several major purchases were delayed to maintain a sufficient working capital balance. Thus, according to the City's budget, these 2002 mid-year shortfalls were addressed in other ways which did not include the elimination of positions.

In support of their decisions to transfer Maestas and Hort to other positions, defendants indicate they were simply trying to make the best use of the plaintiffs' employment. Defendants contend Maestas was transferred because an internal audit indicated it had been ten years since the last physical count of sanitation department carts and bins. However, as noted by Maestas and Hort, this audit was from the year 2000. Thus, between November of 2000 and April 15, 2002, no action was taken to inventory carts and bins, but within one week of the April 9, 2002, City Council meeting, Segura reassigned Maestas from his position as a materials manager in vehicle maintenance to supervising a unit created that same day which was allegedly responsible for the inventory of carts and bins. The lack of clarity concerning Maestas' new duties also erodes the defendants' alleged justification for the transfer. For example, even though the alleged need for Maestas' transfer was to perform an inventory of residential and commercial carts and bins, Maestas' actual duties were limited to only residential carts. Maestas also

5

states that after his reassignment no inventory was actually performed.

Defendants contend Hort was transferred because Mayor Chavez made cleaning up graffiti a priority of his administration, and Hort had supervisory skills. Again, however, the sequence of events is important. Within a week after the April 9, 2002, City Council meeting, Hort was transferred into this position. As emphasized by Maestas and Hort, although graffiti clean-up was a priority for Mayor Chavez, the position remained vacant for approximately four months following Chavez's entry into office in December 2001.

Defendants also contend Hort was transferred because he was the supervisor with the lowest seniority in vehicle maintenance. Hort, however, contends that under departmental seniority rules and based on experience that he is not the person who should have been transferred. Art Torres actually had less seniority than Hort. Pratt asserted that Torres had already left the vehicle maintenance division, but conceded that he remained within the department.

Based on this evidence, a reasonable jury could conclude that the plaintiffs' protected speech was a substantial motivating factor for Pratt's and Segura's threat to eliminate the plaintiffs' positions, their budget proposal to eliminate the plaintiffs' positions, and their transfer of the plaintiffs from positions which would enable them to gain information and report concerning Segura's and Pratt's activities related to the

6

SWMD's truck and tire contracts.[2]

For these reasons, I would reverse the district court's grant of summary judgment on plaintiffs' First Amendment claims and remand for further proceedings.

---

[2] The majority in footnote 5 states that "[u]nlike the Seventh Circuit, we have never held employment action which may tend to chill free speech is necessarily adverse." The majority cites Baca v. Sklar, 398 F.3d 1210, 1220 (10th Cir. 2005), wherein we noted the following: "Although we have never delineated what actions constitute 'adverse employment actions' in the First Amendment context, we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII." Ultimately, the majority concludes that because this case is resolved upon another ground, it is unnecessary to determine whether this court should adopt the tendency to chill free speech standard of the Seventh Circuit. Adding to the dicta, I note that this court stated in Belcher v. City of McAlester, Oklahoma, 324 F. 3d 1203, 1207 n. 4 (10th Cir. 2003) the following: "In reprimanding Belcher, the fire department chilled any future attempts to contact Council members outside of a public meeting. We conclude that this chilling effect is real, and that Belcher has shown that he was subject to adverse employment action as a result of his speech." Belcher appears to be relevant to determining whether the chilling of free speech standard of the Seventh Circuit is applied in this circuit.