# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 3, 2024

Lyle W. Cayce
Clerk

No. 23-20107

Jessica Banks,

*Plaintiff—Appellee*,

*versus*

Daniel Herbrich; Robin Williams; Linda Juarez;
Michael Matchett,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-2023

_____

Before Wiener, Willett, and Douglas, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

This appeal arises out of the removal of R.B., then a four-year-old child, from the custody and care of his mother, Jessica Banks, without parental consent or a court order. After commencing an investigation premised on an anonymous report alleging neglect and abuse, the Texas Department of Family and Protective Services (DFPS) concluded that exigent circumstances existed justifying the emergency removal of R.B. Banks sued DFPS on behalf of herself and her minor son pursuant to 42 U.S.C. § 1983 alleging violations of the Fourth and Fourteenth

No. 23-20107

Amendments.   The district court denied DFPS's motion for summary judgment, concluding that its employees were not entitled to qualified immunity because they violated clearly established law by removing R.B. without court order, parental consent, or exigent circumstances.   We AFFIRM IN PART and REVERSE IN PART.

I

A

On June 10, 2016, DFPS received an anonymous report alleging that Jessica Banks mistreated her four-year-old son, R.B.  It specifically alleged that Banks drank with her family and did drugs while R.B. was in the home, had people in the home who used drugs, had hit R.B. on the back of his head with an open hand, and had threatened R.B., saying things like "give me my f'ing phone before I kill you."  It also alleged that Banks was a sex worker and a stripper, and that it was unknown who cared for R.B. while she worked, as R.B. allegedly did not go to day care or school.  In addition, the report noted that R.B. was "not underweight or malnourished" and that there was "no known concern with gang involvement, weapons or domestic violence."

On June 15, 2016, Investigator Robin Williams was assigned to Banks's case.  Special Investigator Daniel Herbrich joined the investigation the next day.  Linda Juarez and Michael Matchett, Investigation Supervisors, also assisted in the investigation.[1]

The investigation lasted from Wednesday, June 15 to Sunday, June 19, 2016.  Throughout the course of the investigation, Banks provided conflicting

---

[1] DFPS did not appeal the denial of qualified immunity as to Matchett. Accordingly, we do not consider the district court's ruling that Matchett had sufficient personal involvement to warrant the denial of qualified immunity.

information about where she and R.B. lived.[2]  However, when Williams spoke with Banks on June 16, 2016, she expressly denied the allegations in the anonymous report.  She denied abusing R.B.  She admitted that residents of the Berger Road Home had a history of drug use, but she was unaware of drug use occurring in R.B.'s presence.  She also admitted that R.B. had been present for a fight between her mother, Shirley Banks, and Shirley's boyfriend, Justin Muesse, that occurred outside the Berger Road Home, but that she told him to lock the front door and hide in a bedroom.  Significantly, Banks passed a drug test administered that same day.

On June 17, 2016, Herbrich gathered additional information on Banks from Fayette County Assistant Attorney (ADA) James Herbrich.  He learned that Banks physically fought another woman at the Berger Road Home while R.B. was present and that Shirley Banks and Muesse were methamphetamine users with a history of multiple assaults.  Based on the allegations in the anonymous report, Banks's evasiveness as to where she lived, and the information provided by ADA Herbrich, Williams and Herbrich relayed their concerns about R.B.'s safety to Juarez and Matchett.  Juarez then involved Child Protective Services Program Director Dora Montoya and Fayette County District Attorney Peggy Supak to discuss whether there were sufficient grounds to remove R.B. if Banks was unable to identify a Parental Child Safety Placement (PCSP)—a temporary, short-term placement for R.B.  Supak indicated that she believed there were sufficient grounds to remove R.B.

---

[2] For example, Williams spoke to Banks outside a courthouse in La Grange, where she had been subpoenaed to testify before a grand jury.  Banks informed him that she no longer lived at the Berger Road Home and had moved to Houston with her boyfriend, but she could not identify the address.  Later that day, Banks was arrested for outstanding warrants and driving without a license, and at that time, told arresting officers she lived in Giddings, Texas.

After being unable to locate Banks and R.B. on June 17 and 18, Herbrich saw R.B. playing in the front yard of the Berger Road Home on Sunday, June 19. Shirley Banks and Muesse were at the Berger Road Home with R.B. Banks arrived home shortly after Herbrich called Williams and local deputies to assist. Banks identified several possible PCSPs, but Herbrich and Williams rejected each for drug use or criminal history. After several hours, Herbrich contacted Matchett, who advised that Banks had been given enough time to find an appropriate PCSP and that R.B. should be removed. Banks did not consent to DFPS removing R.B., and DFPS did not get a court order because it was a Sunday.

B

Individually and on behalf of her son, R.B., Banks brought this § 1983 suit against Herbrich, Williams, Juarez, and Matchett, all DFPS employees (referred to collectively as "DFPS" herein). DFPS moved to dismiss Banks's Fourth and Fourteenth Amendment claims, arguing they were entitled to qualified immunity.

In its initial ruling on the motion to dismiss, the district court denied qualified immunity, determining that the allegations in the anonymous report, denied by Banks, were not specific enough to suggest that R.B.'s alleged abuse or exposure to drugs were so recent and frequent to rise to the level of imminent danger. The district court further noted that there was no evidence that Herbrich and Williams learned any new information or witnessed any abusive conduct toward R.B.—beyond the allegations in the anonymous report—particularly on the day of removal. The district court stated that "[t]o the contrary, Herbrich and Williams found R.B. under the supervision of his grandmother playing in an age-appropriate manner without any indication of abuse, an altercation, or illegal drug use." Accordingly, the

district court concluded that DFPS had violated Banks's and R.B.'s constitutional rights.

Relying on *Gates v. Texas Department of Protective and Regulatory Services*, 537 F.3d 404 (5th Cir. 2008), the district court further concluded that at the time of R.B.'s removal, the law was clearly established that it was a constitutional violation to remove children from their homes without consent, a court order, or exigent circumstances. The district court also relied on an "Urgent Legal Advisory" memo ("Gates Memo") sent to all DFPS personnel outlining the higher threshold for emergency removals following the holding in *Gates*.

DFPS then reurged qualified immunity in their motion for summary judgment. The district court again determined that the record did not reveal the kind of urgency or immediacy contemplated by either the *Gates* opinion or Gates Memo. Accordingly, the district court denied the motion for summary judgment and rejected qualified immunity to all named defendants for the same reasons asserted in its order on the motion to dismiss.

DFPS timely appealed the denial of qualified immunity as to Herbrich, Williams, and Juarez. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

II

While a denial of summary judgment is not a final judgment, the Supreme Court has held that it is a collateral order capable of immediate review when "(1) the defendant is a public official asserting qualified immunity, and (2) 'the issue appealed concerned, not which facts the parties might be able to prove, but, rather, whether or not certain given facts show a violation of clearly established law.'" *Walsh v. Hodge*, 975 F.3d 475, 480 (5th Cir. 2020) (quoting *Johnson v. Jones*, 515 U.S. 304, 311 (1995)).

"A denial of summary judgment based on qualified immunity is reviewed *de novo*." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 288 (5th Cir. 2005). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When assessing an interlocutory appeal for qualified immunity, however, we cannot review a district court's conclusions that a genuine issue of fact exists concerning whether a defendant engaged in certain conduct." *Walsh*, 975 F.3d at 481 (citing *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc)). In other words, "we can review the *materiality* of any factual disputes, but not their *genuineness*." *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).

This analysis involves two steps: (1) we must determine whether the plaintiffs suffered a violation of their rights as a matter of law, and then (2) we must decide whether the right at issue was clearly established at the time of the alleged misconduct. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).

## III

Banks alleges that Herbrich and Williams violated the Fourth and Fourteenth Amendments. It is well established in this circuit that the Fourth Amendment regulates social workers' civil investigations, *Roe v. Tex. Dep't of Protective & Regul. Servs.*, 299 F.3d 395, 401 (5th Cir. 2002), and protects against unreasonable seizures of children from their homes, *Wooley v. City of Baton Rouge*, 211 F.3d 913, 925 (5th Cir. 2000). Likewise, we have held that "[b]ecause a parent's custody and control of her children is a fundamental liberty interest, the government may violate substantive due process [under the Fourteenth Amendment] when it takes away that right." *Romero v. Brown*, 937 F.3d 514, 519 (5th Cir. 2019). "The procedures required for a constitutional search and seizure under the Fourth Amendment are adequate

to protect [parents'] procedural due process rights and liberty interest in directing the upbringing of their children." *Gates*, 537 F.3d at 435.

We first address the denial of qualified immunity as to DFPS agents Herbrich and Williams. We then address whether the district court properly denied qualified immunity to Juarez, an Investigation Supervisor.

A

The first prong of a qualified immunity analysis asks whether the plaintiff has suffered a constitutional violation. *Walsh*, 975 F.3d at 481. The Fourth and Fourteenth Amendments guarantee that "the government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Gates*, 537 F.3d at 435. "Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home." *Id.* at 429. "This is a flexible inquiry that considers all of the facts and circumstances with no one factor being dispositive." *Id.* In *Gates*, we enumerated a non-exhaustive list of factors to consider in abuse cases. *See id.* We tailored those factors for cases of neglect in *Wernecke v. Garcia*, 591 F.3d 386 (2009). Here, we consider the following *Wernecke* factors:

(1) Available time to obtain a court order;

(2) Risk that a parent might flee with the child;

(3) Availability of less extreme solutions;

(4) Any harm to the child that might arise from his removal;

(5) Nature of the danger facing the child (its severity, duration, frequency, and imminence);

(6) Strength of the evidence supporting immediate removal; and

(7) Presence or absence of parental supervision.

*Id.* at 398. DFPS claims these factors support removal. Banks argues that the record supports a finding that no exigent circumstances warranted removal. In applying these factors to R.B.'s removal, we must view the summary judgment evidence in the light most favorable to Banks, as the non-moving party. *See id.* (citing *Kinney*, 367 F.3d at 350). The record before us shows no evidence whatsoever of exigent circumstances.

Consider our approach in *Gates*. There, we focused on the information known to defendants at the time they made the decision to remove the children from the home. 537 F.3d at 429. Applying the abuse factors, we found that there were allegations of recent (same day) physical abuse, corroborated by several of the children in the home. *Id.* at 430. There was no evidence that defendants could have gathered all this information before the courts closed that day, so it was not possible to obtain a court order in a timely fashion. *Id.* Further, defendants considered and ruled out less drastic options such as having the plaintiff father vacate the house or place the children with a family friend, but concluded he was unlikely to stay away. *Id.* We determined that the defendants did not violate the Fourth Amendment rights of plaintiffs by seizing the children without a court order because, though a "close call," exigent circumstances existed. *Id.*

Here, the information known to DFPS at the time of removal—June 19—included anonymous allegations that were uncorroborated and expressly denied by Banks, unlike the corroborated abuse found in *Gates*. DFPS claims that it could not have sought a court order before June 19 because they had not seriously considered removal until June 17, when Williams and Herbrich learned some of the "most alarming" information about R.B.'s circumstances. However, DFPS knew most of the information on June 16, when Williams first met with Banks. At that time, Banks misrepresented her address, admitted her family had a history of drug use, and noted that she was subpoenaed to testify before a grand jury about a fight between Shirley and

Muesse. Thus, according to DFPS's own timeline of events, they had relevant information prior to Sunday, June 19, to seek a court order, a less extreme alternative.

Similarly, in *Wernecke*, we found a Fourth Amendment violation after concluding that exigent circumstances to remove the children did not exist:

> Although several factors seem to weigh towards the reasonableness of the removal—(1) business hours were concluded and obtaining a court order would likely not be possible in a timely fashion, (2) the risk of flight was high as Mrs. Wernecke had already absconded with KW, and (3) [defendant] attempted to institute both a safety plan and a placement with extended family before placing the boys in state custody—the sum of the Werneckes' facts does not indicate the existence of truly exigent circumstances. The presence of medications and syringes in the home, in childproof containers and under parental supervision, does not rise to the level of exigency. Nor does mere clutter in the home. In the light most favorable to the Werneckes, a reasonable person would not believe that an immediate danger would be posed by JW and JW remaining in the home.

591 F.3d at 399. While drug use and violence in the home are unquestionably concerning, the evidence here does not establish exigent circumstances justifying R.B.'s removal. Notably, Banks *passed* a drug test administered the day she was located at the courthouse in La Grange. DFPS has put forth no evidence—or even alleged—that Shirley and Muesse had used methamphetamines while supervising R.B., simply claiming that their history of drug use was sufficient. When Williams interviewed Banks, however, she indicated that the allegations in the anonymous report were false and that she had no knowledge of anyone doing drugs around R.B. As to physical violence in the home, even DFPS admits that R.B. exhibited no signs of "physical[] injur[y]." Viewing the evidence in the light most favorable to Banks, a

reasonable person would not believe that an *immediate* danger was posed to R.B., who was playing in the front yard in an age-appropriate manner under the supervision of his grandmother when he was removed.

Finally, contrary to DFPS's assertion, *Pate v. Harbers* is not analogous to the instant case. *See* 667 F. App'x 487, 487 (5th Cir. 2016) (unpublished) (affirming the district court's grant of qualified immunity). In *Pate*, the district court weighed the *Gates* and *Wernecke* factors and concluded that there was no constitutional violation, as exigent circumstances existed, particularly where there was "significant evidence" of recent drug possession and use. *Pate v. Harbers*, 2015 WL 4911407, at *7 (W.D. Tex. Aug. 17, 2015). Specifically, Pate admitted to using marijuana and subsequently tested positive for amphetamines. *Id.* at *8. At the time of the child's removal, the totality of the circumstances warranted a finding of exigent circumstances. Pate left the child in the care of her boyfriend, who did not adequately supervise him, and the two-year-old was found by defendants with a diaper full of urine and pen marks on his body. *Id.*

In contrast, Banks denied using drugs and tested negative for any illicit substances. DFPS does not include any allegation that Banks, Shirley, or Muesse, who supervised R.B. at various times, were using drugs around R.B. beyond the refuted allegations in the anonymous report. DFPS characterizes Banks and her family in the most inflammatory terms to elicit an emotional response, but there was insufficient evidence to support the conclusion that R.B.'s life and limb were in imminent danger. "The mere possibility of danger arising in the future is not enough." *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, at *3 (5th Cir. Dec. 7, 2022) (citing *Gates*, 537 F.3d at 429). Unsuitable as R.B.'s living situation may have been, it did not constitute exigent circumstances necessitating *warrantless* removal from his mother. Thus, the seizure of R.B. by DFPS violated the constitutional rights of both R.B. and Banks.

B

The second prong of a qualified immunity analysis asks whether the right at issue was clearly established at the time of the misconduct. *Morrow*, 917 F.3d at 874. The focus of this prong "should be on 'fair warning': qualified immunity is unavailable 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Wernecke*, 591 F.3d at 393 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

DFPS argues that to overcome qualified immunity, Banks "had to identify caselaw holding an emergency child removal was unconstitutional under similar circumstances." It claims she cannot do so because, although the Fifth Circuit has previously analyzed qualified immunity in the context of emergency child removals, "none of these cases dealt with the unique dangers present to R.B." DFPS further faults the district court's qualified immunity analysis as failing to identify on-point precedent, overemphasizing internal DFPS policies, and shifting the burden to DFPS to demonstrate that their conduct was constitutional. We address each argument below.

Our precedent clearly establishes that removal of a child without parental consent, court order, or exigent circumstances violates the Fourth and Fourteenth Amendments. *Gates*, 537 F.3d at 438 ("[N]ow that we have clearly established the law in this area, we expect that [DFPS], law enforcement agencies, and their agents and employees will abide by these constitutional rules and seek to involve the state courts, who act as neutral magistrates in these complicated matters, as early in the process as is practicable."); *Wernecke*, 591 F.3d at 399-401 ("Fifth Circuit law clearly established in June 2005 that the warrantless seizure of the Wernecke boys— in the absence of any imminent danger—was a constitutional violation.");

*Romero*, 937 F.3d at 521-22 ("It is thus clearly established that a court order or exigency is the predeprivation process that is due when social workers remove a child."); *McMurry*, 2022 WL 17493708, at \*4 ("Brunner's actions violated the parents' right to procedural due process under the Fourteenth Amendment, law that was clearly established as *Gates* placed officials 'on notice that they violate procedural due process when they remove children without a court order or exigent circumstances.'"(citation omitted)). These cases have clearly established that R.B. and Banks had the right not to have their child-parent relationship invaded by government actors without court order, consent, or exigent circumstances.

Contrary to DFPS's claim, our precedent does not require that the district court identify caselaw holding that an emergency child removal was specifically *unconstitutional* under similar circumstances, nor does it require a case directly on point. "[I]t is not necessary that 'the very action in question has previously been held unlawful.'" *Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 326 (5th Cir. 2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Instead, there can be notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (internal quotation marks and citation omitted). Accordingly, this argument lacks merit.[3]

Further, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*,

---

[3] Even if this were required, the *Wernecke* court specifically found that an emergency child removal violated the Fourth and Fourteenth Amendments, so the district court *did* identify a case holding that an emergency child removal was unconstitutional. *See Wernecke*, 591 F.3d at 400-01.

563 U.S. 731, 741 (2011)).  Here, there is no question, based on the ample precedent before us, that the constitutional rights of a child and his parents are violated when the government seizes the child absent consent, court order, and exigent circumstances.  Moreover, exigent circumstances have been clearly defined *at least* since *Gates* in 2008 to require imminent danger of physical or sexual abuse.  *See Gates*, 537 F.3d at 429.  That evidence is entirely absent here.

Turning to the district court's reliance on the internal policies of DFPS, specifically the Gates Memo, we find no error.[4]  The district court permissibly consulted the Gates Memo in the context of notice and found that DFPS's conduct contradicts it.  *See, e.g., Hope*, 536 at744-45 (finding that a DOJ report buttressed its conclusion that respondents violated clearly established law).  Under our current caselaw, violations of internal procedures or policies are insufficient to give rise to constitutional violations. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992) (stating that "even a negligent departure from established police procedure does not necessarily signal violation of constitutional protections"); *Harris v. Payne*, 254 F. App'x 410, 416-17 (5th Cir. 2007) (unpublished) (per curiam) (finding no Fourth Amendment violation where, *inter alia*, defendants' violation of internal policies "[did] not transform [plaintiff's] claim into one of constitutional dimension").  But when properly supported by precedent,

_____

[4] The district court referenced the Gates Memo, an internal DFPS document created in the aftermath of the *Gates* decision which requires DFPS employees to "obtain consent or file for a court order prior to removal of the child unless life or limb is in immediate jeopardy or sexual abuse is about to occur."  It further states that a "neglect case will rarely support an *emergency* removal without a court order" and that employees "must have information that suggests that the child in question is in danger of harm *now*." It lists examples of neglect cases warranting emergency removal, including "an infant at home alone, a case of medical neglect that has become urgent, or a toddler found wandering in the street."

these internal procedures bolster a finding that defendants had "fair and clear warning" of the clearly established right at issue. *Hope*, 536 U.S. at 745-46 ("Even if there might once have been a question regarding the constitutionality of this practice, the Eleventh Circuit precedent . . . as well as the DOJ report condemning the practice, put a reasonable officer on notice. . ..");  *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("In fact, the guidelines of petitioner's own department placed him on notice that he might be liable. . .."). Thus, the district court properly concluded that the Gates Memo undercut DFPS's argument that exigent circumstances existed warranting removal.

Finally, the district court did not improperly shift the burden onto DFPS, but appropriately addressed and relied on the correct standard concerning burdens of proof. DFPS cherry picks one statement made by the district court, in which it claimed that DFPS failed to offer any authority supporting the argument that a child's *prior* exposure to drugs indicates that life or limb is in immediate jeopardy, supporting emergency warrantless removal. But, as Banks correctly argues, the district court was simply observing that DFPS did not point to *any* circumstances on June 19 to remotely suggest that R.B. was in imminent danger.

In sum, relying on our ample precedent outlining the contours of the constitutional rights at issue, bolstered by DFPS's own internal memo to its employees clarifying the higher burden for emergency removals following *Gates*, we conclude that DFPS's conduct violated the clearly established rights of R.B. and Banks. This precludes the defense of qualified immunity at the summary judgment stage as to Herbrich and Williams.

## C.

Finally, DFPS argues that Linda Juarez, an Investigation Supervisor, was not meaningfully involved in R.B.'s removal because "she did not

conduct the investigation into R.B.'s situation, nor did she order his removal." Banks argues that the evidence supports that Juarez was directly involved in the decision to remove R.B.

The district court found that "[a]lthough Juarez was not the ultimate decisionmaker, it is clear that she was personally involved in the decision to remove R.B." It considered her specific involvement, including staffing the case with Montoya, who decided on removal, and participating in the phone conference with ADA Supak, who also recommended removal. Therefore, the district court concluded that "Juarez's actions were causally connected to the alleged constitutional violation," and denied qualified immunity. We disagree.

"[T]o state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violations alleged." *DeMarco v. Davis*, 914 F.3d 383, 390 (5th Cir. 2019) (quoting *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995) (per curiam)). "A supervisory official is held to a standard of 'deliberate indifference,' which requires proof that the supervisor 'disregarded a known or obvious consequence of his action.'" *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003) (quoting *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997)).

Juarez is entitled to qualified immunity because, like the supervisor in *Wernecke*, she was "neither the ultimate decision maker, nor was she actively involved in the decision to remove the [child]." *See* 591 F.3d at 401. Juarez neither conducted the investigation into R.B. nor ordered his removal; she even admitted her lack of authority to order R.B.'s removal. She merely escalated the case to Program Director Montoya and remained on the phone while Williams contacted ADA Supak. On the date of removal, it was Matchett, Montoya, and Supak who instructed R.B.'s removal—not Juarez.

No. 23-20107

Juarez was, at most, "merely a conduit for information between" the investigators and the program director. *See Wernecke*, 591 F.3d at 402. Though the dissent views Juarez as more than a conduit of information because she escalated the case to Montoya, the supervisor did the same in *Wernecke* and we nonetheless concluded that she was entitled to qualified immunity. *Wernecke* is not distinguishable based on the number or type of depositions in the record. We must instead look to what the available evidence shows. In *Wernecke*, the court evaluated the available record evidence and concluded that it showed that the supervisor was a mere conduit for information, lacked authority to order removal, and was thus entitled to qualified immunity. So too here. Even though the quantity of record evidence describing Juarez's role in DFPS is greater here than in *Wernecke*, it nonetheless shows that Juarez, like the supervisor in *Wernecke*, lacked independent authority to order removal and was a conduit of information between Williams and the program director. *Wernecke* controls and Juarez is entitled to qualified immunity.

## IV

For the foregoing reasons, we AFFIRM the district court's denial of qualified immunity as to Williams and Herbrich and REVERSE the district court's denial of qualified immunity as to Juarez.

JACQUES L. WIENER, JR., *Circuit Judge*, concurring in part and dissenting in part:

I concur in my colleague's thoughtful qualified immunity analysis and agree that DFPS's conduct violated the Plaintiffs–Appellees' clearly established rights. However, I would further hold that no DFPS Defendant is entitled to qualified immunity—including Linda Juarez. I therefore respectfully dissent from Part III.C of the majority opinion.

I first highlight a few relevant facts. Robin Williams was the DFPS investigator assigned to the Banks case. Michael Matchett was Williams's supervisor, but, because he was new on the job, Investigation Supervisor Linda Juarez "provided him with assistance and back up as needed." As such, Williams went to Juarez with concerns about the Banks family. Juarez believed that the facts, recounted by Williams, were sufficiently serious as to require elevation to the Program Director, Defendant Dora Montoya, who ultimately approved R.B.'s removal. The district court denied wholesale DFPS's motion for summary judgment, concluding that Juarez was personally involved in the alleged deprivation of Plaintiffs' rights. I would affirm that wholesale denial of summary judgment.

To state a cause of action under 42 U.S.C. § 1983, a defendant must have been either "personally involved in the constitutional violation," or their acts "causally connected" to the violation. *Magnolia Island Plantation, L.L.C. v. Whittington*, 29 F.4th 246, 251 (5th Cir. 2022) (quoting *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)). "[I]ndividual liability for a government official who violates constitutional rights . . . turns on traditional tort principles of 'but-for' causation." *Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018); *see also id.* at 641 (focusing on whether the defendant "set in motion" the violation) (quoting *Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir. 2005)). The final decisionmaker is not

the only defendant who can be held liable in a § 1983 case. *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009) (holding that a defendant is personally involved when they are "the ultimate decisionmaker" *or* is "actively involved in the decision to remove the [child]"); *see also Sims*, 894 F.3d at 639, 641 ("[S]omeone who is not a final decision maker and makes a recommendation that leads to the plaintiff being harmed can be liable . . . ."); *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 758 (5th Cir. 1986) (affirming a defendant's conviction even though "he only had recommending authority").

Here, Juarez "set in motion" R.B.'s removal by deciding whether to "approve the worker's [i.e., Williams's] decisions or provide directions on changing them." *See Sims*, 894 F.3d at 641. Had Juarez disagreed with Williams's analysis of the Banks case, it never would have been brought to Montoya, the ultimate decisionmaker, and R.B. would not have been removed. This is not liability based on bare *respondeat superior*, *see Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003), or based on Juarez's role as a supervisor, *see Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404, 436 (5th Cir. 2008). It is instead based on Juarez's personal decision to elevate the case to Montoya, which constitutes "an affirmative link between the incident and some act by the defendant." *Murphy v. Kellar*, 950 F.2d 290, 292 n.7 (5th Cir. 1992) (citing *Rizzo v. Goode*, 423 U.S. 362, 371 (1976)).

The majority analogizes to *Wernecke v. Garcia*, in which we held that serving as a "conduit for information" was insufficient to establish personal involvement. 591 F.3d at 402. But the level of discretion and decision-making power enjoyed by Juarez goes beyond serving as a mere "conduit." *See id.* Unlike in *Wernecke*, in which no other record evidence linked the supervisor to the case, Williams's deposition describes Juarez's involvement. *See id.* at 401 ("Notably, Mr. Wernecke's affidavit does not mention Trainer . . . ."); *id.* at 402 (emphasizing that Trainer's own deposition was "the only piece of

evidence in the record put forth by the Werneckes that contains any information about her knowledge and involvement"). Finally, as noted in the majority opinion, DFPS does not contest Matchett's personal involvement; however, he did not become involved in the case at all until removal had already been approved. It is unclear how Matchett—but not Juarez—could be personally involved in the alleged constitutional violation.

Especially given the stage in litigation, I would affirm the district court in its entirety, including the holding that Juarez was causally connected to the alleged constitutional deprivation.