FILED
United States Court of Appeals
Tenth Circuit

February 13, 2019

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

CRAIG HEDQUIST and HEDQUIST
CONSTRUCTION, INC., a Wyoming
Corporation,

        Plaintiffs - Appellants/Cross-
        Appellees,

v.

ANDREW BEAMER,

        Defendant - Appellee/Cross-
        Appellant

and

JOHN PATTERSON and THE CITY OF
CASPER,

        Defendants - Appellees,

Nos. 17-8036 & 17-8042
(D.C. No. 1:14-CV-00045-ABJ)
(D. Wyo.)

_____

ORDER AND JUDGMENT*

_____

Before **LUCERO**, **HOLMES**, and **EID**, Circuit Judges.

_____

From January 2013 until July 2015, Craig Hedquist (Hedquist) was a member of

the Casper, Wyoming City Council. During his time on the Council, Hedquist developed

_____

    * This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and
10th Circuit Rule 32.1.

contentious relationships with several City employees, including Defendants John Patterson (then the City Manager of Casper) and Andrew Beamer (then a City Engineer). After resigning from the City Council, Hedquist brought this action against Patterson, Beamer, and the City of Casper (Defendants) under 42 U.S.C. § 1983, claiming Defendants retaliated against him for exercising his First Amendment rights. He alleges that Patterson committed many forms of retaliation, including instigating investigations into Hedquist's business dealings and filing a petition to have Hedquist removed from the City Council.

Hedquist is also the principal owner of Hedquist Construction, Inc. (HCI), which has performed construction projects for the City. HCI joined this action and alleges that Beamer retaliated against it by influencing the City into labeling it a non-responsible bidder, which resulted in the City refusing to award HCI contracts despite being the lowest bidder. Both Hedquist and HCI (Plaintiffs) allege that these adverse actions were in retaliation to Hedquist identifying and speaking out against inefficient and incompetent practices by the City and its officials.

After extensive discovery, Defendants moved for summary judgment. On Hedquist's claim, the district court granted summary judgment in favor of Defendants Patterson and the City of Casper. On HCI's claim, the court granted summary judgment in favor of Beamer and the City of Casper. The district court also found that Patterson was entitled to qualified immunity, while Beamer was not.

Plaintiffs appealed to this court, and Beamer filed a cross-appeal on the sole issue of his entitlement to qualified immunity. Because we conclude that neither plaintiff has

demonstrated that protected speech motivated Defendants' alleged adverse actions, we affirm. We also affirm the district court's denial of Plaintiffs' discovery motions.[1]

I.

A.

Hedquist is a principal of HCI, a long-time bidder and contractor on road and infrastructure projects in the City of Casper. In 2012, Hedquist announced his candidacy to represent Ward II on the nine-member Casper City Council. He announced his campaign by publishing a letter in the Casper Star Tribune in the summer of 2012. The letter was critical of "the inefficiencies, policies and seeming lack of 'common sense' in our government." Vol. 2 at 269. Hedquist won his election and took office on January 2, 2013. HCI continued to work on City projects while Hedquist served as a member of the City Council.

Defendant John Patterson was also a City Councilmember and worked as the City Manager from August 1, 2011 until October 30, 2015. Defendant Andrew Beamer worked as a City Engineer during the controversies of this case. As a City Engineer, Beamer managed capital construction projects, visited jobsites, and participated in construction-related meetings.

Consistent with his campaign promises, Hedquist discussed with City employees how to more efficiently run City construction projects. In August 2012, Hedquist met

---

[1] We do not reach any questions of qualified immunity, including the issue raised in Beamer's cross-appeal, because we find Hedquist and HCI have presented insufficient evidence to demonstrate the violation of a constitutional right.

3

with Patterson and other City officials, during which he accused City employees of incompetently managing construction projects. Vol. 18 at 3028. In December 2012 (after Hedquist won the election but before he took office), Hedquist, along with several other contractors, met with Patterson and his assistant Pete Meyers to discuss construction projects in and around the City. At this meeting, Hedquist was critical of allegedly inefficient actions taken by the City. He and the other contractors suggested the City should outsource more work because private firms are generally cheaper and more effective. *Id.* at 3158–60. On December 28, Patterson emailed Hedquist to thank him for calling the meeting and summarize what was discussed. He noted that "[t]he meeting went well and there was generally a positive view of the working relationship with our local contractors." *Id.* at 3162–63.

In February 2013, shortly after taking office, Hedquist requested job cost data for the prior three years of street milling performed by the City with its own equipment and personnel. Vol. 26 at 5000. Patterson assigned the task to newly-hired Public Services Director Rick Harrah, *id.*, who discovered multiple flaws in the City's tracking of operations costs, Vol. 19 at 3193–94. In Harrah's report to Patterson, he stated that "[i]t is abundantly clear that I need to make changes to our current cost tracking system. It is completely reasonable for a citizen or city councilmember to expect accountability from their municipal workforce, and we should be able to easily provide this information when requested." *Id.* at 3194. Harrah met with Hedquist to review the cost data but claims that the cost-accounting flaws were not discussed then or in the future. Vol. 26 at 5002.

During 2013, HCI was the contractor on four public works projects for the City. At a progress meeting for the project known as "Indian Paintbrush" in June 2013, Hedquist met with Harrah, Beamer, and Assistant City Engineer Scott Baxter. Vol. 12 at 1649. They discussed how much concrete should be replaced on the "curbwalk." At the meeting, Hedquist informed the others that he was speaking both as the principal of HCI and as a City Council member. Beamer developed concerns that Hedquist's dual status as Councilmember and contractor was a conflict of interest, and he started bringing a recording device to future meetings and conversations with Hedquist.

On August 27, 2013, Hedquist attended a meeting with his attorney, Michael Lansing; Patterson; Mayor Kenyne Schlager; and City Attorney Bill Luben. Vol. 12 at 1744. At the meeting, Hedquist complained about Beamer interfering in HCI's performance of City contracts. *Id.* He also was displeased about delayed payments of over $750,000 that the City owed HCI. *Id.* Patterson acknowledged the delay, and a "pre-writ" check was prepared and deposited the next day. *Id.* at 1737; Vol. 2 at 275.

On August 28, Hedquist attended a progress meeting about a construction project with Beamer, other City employees, and the project manager (a company called Civil Engineering Professionals, Inc., or CEPI). Beamer recorded the meeting, which took place at the jobsite. Attendees discussed the status of the construction project. At one point, Beamer suggested opening one of the streets closed for construction, and Hedquist responded:

Hedquist:     You guys going to start paying on time?

Beamer: We've already had this discussion, but . . .

Hedquist: Oh no. You f***ing going to stand up, bi***? Are you going to start paying?

Beamer: What did you say?

Hedquist: You heard me.

Beamer: I did hear you.

Hedquist: Yeah. Yeah. The only part of the contract that you even comprehend is the side that I have to –

Beamer: That's not true, Craig.

Hedquist: Yeah.

Beamer: But, you know, we can have this discussion another time.

Hedquist: We will have this discussion, I promise you.

Vol. 16 at 2603.

Later that day, Beamer played the recording of the exchange for Harrah, his supervisor. The next day, Harrah emailed Patterson expressing his outrage over Hedquist's actions and mentioning other instances of Hedquist using similarly aggressive and derogatory language with City employees. Vol. 12 at 1623–26. Harrah also accused Hedquist of using his position on the City Council to get away with this behavior. *Id.*

Beamer filed a workplace violence complaint against Hedquist on August 29, 2013. Vol. 16 at 2591. Beamer indicated on the written complaint that, as a result of the altercation, HCI should "no longer be considered a responsible bidder on future projects." Vol. 19 at 3369. The attorney hired to investigate the complaint, Kathleen Dixon, interviewed witnesses to the incident, including Beamer and Hedquist, and determined that the workplace violence complaint was substantiated. Vol. 16 at 2609. She

concluded that the combination of Hedquist's language, facial expressions, and physical movements indicated that he was threatening Beamer. *Id.*

In addition to the workplace violence investigation, the City Council decided to investigate the possible conflict of interest arising from Hedquist's position on the City Council and simultaneous involvement with HCI. On September 27, 2013, a Notice of Contested Case Rights and Procedures, signed by Mayor Schlager, was served on Hedquist. Vol. 12 at 1654–59. The Notice listed the state statutes and Casper city ordinances that Hedquist's conduct potentially violated. *Id.* Casper attorney Wes Reeves served as counsel for the City Manager's office for this investigation. Vol. 26 at 4838. On December 10, 2013, Reeves determined there was "clear and convincing evidence" that Hedquist had violated ethics and conflict of interest laws. Vol. 12 at 1661.

On January 17, 2014, Reeves and Patterson filed a Petition for Removal from Office or Other Remedies and Notice of Contested Case Rights and Procedures concerning the conflict of interest and workplace violence allegations. Vol. 12 at 1666–74. The Petition was eventually dismissed, but on April 29, 2014, the City Council held an informal hearing about whether Hedquist's conduct constituted a conflict of interest. The meeting included testimony by Beamer, Harrah, and others who claimed that Hedquist was abusing his position on the Council and using his influence to enrich HCI. Vol. 26 at 4844–5030. Neither Hedquist nor his attorneys attended the meeting. On May 15, 2014, the City Council voted to request that Hedquist resign as City Councilman based on allegations of him violating the City's

7

code of ethics. *Id.* at 4842–43. Though Hedquist declined to resign at that time, he eventually resigned in July 2015. Vol. 2 at 289.

HCI's claims against Defendants center around four contracts in progress during 2014 that had run past their contractual due date. The projects in dispute were mediated pursuant to the contracts' terms with the assistance of representatives of CEPI. Vol. 13 at 1834–37. HCI agreed to pay liquidated damages as part of the settlement. *Id.* HCI alleges that the City Council opportunistically used these mediations as pretext to label HCI a non-responsible bidder. Under Wyoming law, city public works projects shall be given "to the lowest bidder who shall be determined qualified and responsible in the sole discretion of the governing body." Wyo. Stat. § 15-1-113(c). In 2015, HCI submitted the lowest bids for five public works contracts with the City of Casper. The City Public Works Department recommended the contracts go to the second-lowest bidder for each project instead of HCI, citing the four previous projects that went to mediation as justification. Vol. 13 at 1914–17. HCI claims this was retaliation and cost the City over $800,000.

### B.

Hedquist filed an initial complaint on February 27, 2014 and, together with HCI, filed a second amended complaint on September 30, 2015. The second amended complaint alleged two causes of action, both arising under 42 U.S.C. § 1983. The first was brought by Hedquist against Councilman Patterson, individually and in his official capacity, and alleged that Patterson retaliated against his protected speech when Patterson: (1) instigated the workplace violence and conflict of interest investigations into

8

Hedquist; and (2) initiated proceedings to have Hedquist removed from the City Council. Vol. 2 at 290–91. The second cause of action was brought by HCI against City Engineer Beamer, individually, and the City of Casper, alleging that Beamer and the City retaliated against HCI's protected speech by labeling HCI a non-responsible bidder with the intention of denying HCI public works contracts. *Id.* at 292–93.

The parties commenced discovery. Both the discovery cutoff date and the trial date were repeatedly pushed back. Plaintiffs filed three motions to compel further discovery during 2016, all of which the district court denied.

On August 26, 2016, all parties filed motions for summary judgment. The Defendants' motions all generally attacked the sufficiency of the evidence as it related to the elements of a First Amendment retaliation claim. They argued that Plaintiffs' speech was not protected and that it was not a motivating factor in the alleged adverse actions. Beamer and Patterson also raised the affirmative defense of qualified immunity. Dist. Ct. Op. (Op.) at 15–17.

On April 14, 2017, the district court entered an order granting summary judgment for Defendants on both Hedquist's and HCI's claims. Op. at 52. The district court held that Hedquist's speech was not made pursuant to his official duties as a public employee. *Id.* at 27. Next, it concluded that Hedquist's speech as a City Councilman involved matters of public concern, *id.* at 35, while speech by HCI did not, *id.* at 34. The court then determined that both Plaintiffs failed to produce evidence that protected speech was a substantial or motivating factor in the alleged adverse actions taken against them. *Id.* at

41. The court also granted qualified immunity for Patterson but denied it for Beamer. *Id.* at 44, 47.

Plaintiffs appeal the district court's rulings. They argue that the court was correct to find that Hedquist's speech as a City Councilman was of public concern, but erred in holding that the speech was not a substantial or motivating factor in the alleged retaliation. Plaintiffs also assert that the district court erred in finding that HCI's speech was not of public concern. Plaintiffs seek reversal of the district court's grant of qualified immunity for Patterson. Finally, Plaintiffs contend that the district court abused its discretion in denying their discovery motions.

## II.

This court reviews "a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014). "Summary judgment is warranted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). This court conducts its review from the "perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008) (quotation omitted).

To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving

party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, the government has a "countervailing interest in controlling the operation of its workplaces." *Lane v. Franks*, 573 U.S. 228, 236 (2014). "[T]he interests of public employees in commenting on matters of public concern must be balanced with the employer's interests 'in promoting the efficiency of the public services it performs through its employees.'" *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

This court employs one of two tests when analyzing a First Amendment retaliation claim. The *Garcetti/Pickering* test applies when the free speech claim is based on retaliation by a government employer. *See id.* at 724. This test comprises five elements:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

11

*Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (citation omitted). Claims by independent contractors are also subject to the *Garcetti/Pickering* analysis. *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 673 (1996).

This court has outlined an alternative test "to be used in free-speech retaliation claims against 'a defendant who is not the plaintiff's employer and when there is no contractual relationship between them.'" *Leverington*, 643 F.3d at 729 (quoting *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)). The *Worrell* test requires proof of three factors to support a case of retaliation:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Worrell*, 219 F.3d at 1212 (quotation omitted). In deciding which test to apply, "the relevant inquiry" is "the extent to which [the defendant] had authority over [the plaintiff's] employment situation." *Leverington*, 643 F.3d at 730 n.8.

The district court applied the *Garcetti/Pickering* test to all of Plaintiffs' claims, but the parties now submit that the *Worrell* test should apply to some or all of the claims. Both tests require proof that the protected speech "motivated"—or caused—the adverse action. However, each test frames the motivation requirement slightly differently: In the *Worrell* test, the adverse action must be *substantially* motivated by the protected speech. Under *Garcetti/Pickering*, protected speech must be merely *a* motivation. However, this court has held that, even under *Garcetti/Pickering*, "the employee must show the protected speech *played a substantial part* in the employer's decision to adversely alter

12

the employee's conditions of employment." *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005) (emphasis in original).  Accordingly, we conclude that there is no meaningful difference in the quantum of motivation required to prove causation in the two frameworks.  *See id.*

The motivation prong is a factual issue typically decided by a jury.  *Trant*, 754 F.3d at 1165.  However, summary judgment is appropriate when there "is no evidence in the record from which a trier of fact could reasonably conclude the [protected speech] was a motivating factor in [the plaintiff's] termination."  *Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cty.*, 661 F.3d 477, 484 (10th Cir. 2011) (brackets in original) (quotation omitted).

> To withstand summary judgment at [the causation step], therefore, an employee must produce evidence linking the employer's action to the employee's speech.  Speculation or hunches amidst rumor and innuendo will not suffice.  . . .  Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive.  But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision.  . . . [E]vidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link.

*Maestas*, 416 F.3d at 1188–89 (internal citations, quotation, and alterations omitted).

"[E]vidence of causation may include evidence the employer expressed opposition to the employee's speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing."  *Id.* at 1189 (internal citation omitted).

13

## IV.

For each of Plaintiffs' claims, we conclude that they have failed to produce evidence sufficient to show that protected speech motivated the alleged adverse action against them. Plaintiffs have shown that the alleged adverse action followed protected speech. But that evidence—by itself—does not support a First Amendment retaliation claim. Rather, Plaintiffs must point to evidence in the record that protected speech motivated those claimed injuries. *See Butler v. City of Prairie Village*, 172 F.3d 736, 746 (10th Cir. 1999) (finding plaintiff had "not established that the speech was a motivating factor in his termination" because "mere temporal proximity of [a p]laintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive."). We therefore affirm the district court's dismissal of Plaintiffs' First Amendment retaliation claims.

## A.

Starting with Hedquist's claims of retaliation, the district court identified three instances of protected speech by Hedquist: (1) the 2012 letter Hedquist published in the Casper Star Tribune criticizing the City government's "inefficiencies" and announcing his Council candidacy (Vol. 2 at 269); (2) the August 2012 meeting with Patterson regarding wasteful and inefficient City spending (Vol. 18 at 3028–29); and (3) an August 27, 2013 letter to Patterson requesting "job costing information for work the City of

14

Casper performed on Aster Street this year," (Vol. 19 at 3348). Op. at 34–35.[2] The district court then considered three alleged acts of retaliation against Hedquist: "a work place investigation, a conflict of interest investigation, [and] removal proceedings . . . ." Op. at 22.[3] We conclude that each claim of retaliation fails because Hedquist has not demonstrated "that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell*, 219 F.3d at 1212 (quotation omitted).

In support of his claim that the district court erred, Hedquist merely asserts that, "when viewing the evidence in the light most favorable to Hedquist[,] there is ample evidence of a continuing course of retaliation related to Hedquist's protected speech that is more expansive than the investigations cited by the district court." Aplt. Br. at 43. Hedquist, though, fails to grapple at all with the question of motivation, claiming only that the "motivating factor" question should have gone to the jury. *Id.* The bare assertion that retaliation took place in response to protected speech is not sufficient to withstand summary judgment, *see Maestas*, 416 F.3d at 1188–89, particularly in light of the non-retaliatory rationales that exist for all of Defendants' allegedly retaliatory conduct.

---

[2] Defendants do not challenge the district court's conclusion that Hedquist's speech on these three occasions qualifies as protected speech. *See* Aple. Br. at 23, 26.

[3] On appeal, Hedquist broadens the list of allegedly retaliatory acts, raising several specific instances of retaliation the district court did not consider. In keeping with the general "principle that issues not passed upon below will not be considered on appeal," *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993), our review is limited to only those instances of retaliation discussed by the district court.

The first instance of alleged retaliation was the workplace violence investigation, which began in September 2013. The investigation immediately followed Hedquist's actions toward Beamer at the construction site in August 2013. During the altercation, Hedquist brought up the City's delinquent payment to HCI and said, "You f***ing going to stand up, bi***? Are you going to start paying?" Vol. 16 at 2603. Beamer had recorded the exchange. The next day, Beamer filed a workplace violence complaint. An independent attorney, Kathleen Dixon, investigated the complaint and determined, after reviewing the recording and statements from other witnesses, that Hedquist had threatened Beamer with physical violence. Vol. 16 at 2609. On appeal, Hedquist fails to point to any evidence in the record indicating that the allegedly retaliatory workplace violence investigation was motivated by anything other than Hedquist's threats of violence toward Beamer at the construction site.

Hedquist's claims of retaliation based on the conflict of interest investigation similarly fail. Hedquist has failed to point to any evidence suggesting protected speech was a substantial motivating factor in the initiation of that investigation. The summary memorandum prepared by independent attorney Wes Reeves clarifies the basis for the investigation. First, the report notes that Hedquist served as a council member at the same time that his construction company "was obligated to perform several significant construction projects for the City . . . ." Vol. 12 at 1661. While Hedquist was initially permitted to act as both a council member and city contractor, the memorandum details various examples of "[t]he difficulties created by Mr. Hedquist's conflicting loyalties," including "routinely us[ing] his office to skip the chain of command to obtain access to

16

the City Manager, Department heads and staff for the purpose of arguing for the interest of his company." Vol. 12 at 1662–63. Ultimately, Reeves determined that there was "clear and convincing evidence" of Hedquist's conflict of interest. *Id.* at 1661.

It is true Reeves's memorandum also referenced Hedquist's August 27, 2013 letter requesting job cost information for a construction project as a possible example of Hedquist seeking "an advantage in future bidding work." *Id.* at 1663. As noted above, the district court identified this letter as protected speech because it "touche[d] on government efficiency." Op. at 34. But again, Hedquist does not provide any evidence indicating the conflict of interest investigation, including Reeves's memorandum, was motivated by anything other than concerns about whether Hedquist could keep his dual roles as City Councilman and owner of HCI separate.

Hedquist's claims of retaliation based on the initiation of the Petition for Removal from Office also fail. As the district court found, and the record bears out, the Petition for Removal filed by Patterson and Reeves was motivated by the results of the workplace violence and conflict of interest investigations. Op. at 40–41. The Petition catalogued several instances where Hedquist appeared to be improperly using his role as City Councilman to benefit HCI. Vol. 12 at 1670–73. The Petition also referenced the August 28, 2013 altercation between Hedquist and Beamer as further grounds for removal. *Id.* at 1671–72. Because the cause of the Petition for Removal can be clearly traced to unprotected conduct, and Hedquist has produced no evidence to the contrary, it provides no basis for a retaliation claim.

17

Though the City's Petition for Removal eventually failed, the City Council voted to hold an informal hearing to determine whether Hedquist's conduct constituted a conflict of interest. Vol. 26 at 4926. Reeves, Beamer, and other City employees made statements at the hearing expressing their frustrations with Hedquist's actions as City Councilman. Neither Hedquist nor his attorneys attended the hearing. *Id.* at 4931. We conclude that the hearing does not constitute actionable retaliation for the same reasons that the Petition for Removal is not actionable: Hedquist has produced no evidence that it was motivated by protected speech, rather than concerns about the workplace violence and conflict of interest investigations.

In sum, Hedquist's conclusory assertions and passing references to "ample evidence" in the record are not enough to withstand summary judgment. Accordingly, we affirm the district court's dismissal of Hedquist's retaliation claims against Patterson.

B.

We turn now to the other plaintiff in this case, HCI. HCI alleges that City Engineer Andrew Beamer and the City of Casper retaliated against it by refusing to award it construction contracts in 2015, despite being the lowest bidder.

The district court concluded that none of the speech attributed to HCI was of public concern and, therefore, was not protected under a First Amendment retaliation claim.[4] Op. at 32. The court considered "twenty-seven (27) separate instances in which

---

[4] Because Hedquist is the principal and owner of HCI, most of the speech attributed to HCI was in fact made by Hedquist. For our purposes, we consider any speech made by Hedquist when he was acting on behalf of HCI as speech made by HCI. *See Glover v. Mabrey*, 384 F. App'x 763, 766 (10th Cir. 2010) (unpublished)

18

HCI alleged it had engaged in protected speech for which it was later retaliated against," and determined that each of those instances concerned "matters that relate to the contracts with the City, being paid in accordance with those contracts, or other grievances the company may have had with the City." *Id.* Because none of the speech was constitutionally protected, the district court dismissed HCI's claim of retaliation. *Id.* at 33. The district court did not reach the motivation prong of either the *Worrell* or *Garcetti/Pickering* frameworks.

HCI narrows its scope on appeal, arguing that two instances of speech were of public concern and that the district court erred in holding otherwise. The instances comprise: (1) the December 2012 meeting of contractors and City officials organized and led by HCI; and (2) the June 2013 project meeting involving HCI and multiple representatives of the City of Casper at the Indian Paintbrush construction site. Aplt. Br. at 44.

We need not consider whether HCI's speech was of public concern. Assuming both instances of HCI's speech do qualify as touching on matters of public concern, we find HCI has failed to demonstrate that either speech motivated Defendants' alleged retaliation. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("[W]e may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court . . . .").

---

(statements made by the owner of a construction company were the basis of the company's First Amendment retaliation claim).

HCI asserts that the City retaliated against it by refusing to award it construction contracts. Under Wyoming law, city public works projects shall be given "to the lowest bidder who shall be determined qualified and responsible in the sole discretion of the governing body." Wyo. Stat. § 15-1-113(c). In 2015, HCI submitted the lowest bids for five public works contracts with the City of Casper, but the City Public Works Department recommended the contracts go to the second-lowest bidder for each project instead of HCI. Vol. 13 at 1914–17. HCI alleges that Beamer influenced the City Council into labeling HCI "non-responsible," allowing the Council to award contracts to other bidders.

As with Hedquist's claims of retaliation, HCI fails to show a causal connection between HCI's protected speech and the contracting dispute. First, as HCI acknowledges, the alleged retaliation occurred more than two years after the December 2012 meeting. "[E]vidence such as a long delay between the employee's speech and challenged conduct . . . tend[s] to undermine any inference of retaliatory motive and weaken the causal link." *Maestas*, 416 F.3d at 1189.

Further, HCI fails to address the "intervening events," *see id.*, that more readily explain the allegedly adverse action. Specifically, HCI was awarded four contracts for the City in 2014 and failed to satisfactorily perform them by their contractual due dates. Vol. 13 at 1834–37. The City and HCI voluntarily went to mediation to settle those contracts and agreed on a liquidated damages settlement, to be paid by HCI. *Id.* When the City subsequently labeled HCI a non-responsible bidder, it cited the four 2014 contracts, not any protected speech by Hedquist or HCI. *Id.* at 1914–17.

HCI's attempts to explain these intervening events are unavailing.  HCI first claims—without any citation to the record—that the City's actions were "unprecedented" and that no other bidder has been subject to "scrutiny because of prior late performance or assessment of liquidated damages."  Aplt Br. at 47–48.  HCI also suggests that, because the City labeled HCI a non-responsible bidder "the very first time" the opportunity arose, Beamer, acting on behalf of the City, must have had that "intent" all along.  *Id.* at 48.  HCI, though, cannot support an inference of motivation with mere "suspicion and hunches," *Maestas*, 416 F.3d at 1189, and it has pointed to no evidence in the record showing the City Council based its decision on speech made at either the December 2012 or June 2013 meetings.  Accordingly, we affirm the district court's dismissal of HCI's claims against Beamer and the City.[5]

V.

Plaintiffs also appeal the district court's denial of three motions to compel discovery and a motion to supplement the dispositive motion record.  The first motion sought to compel discovery of documents that Defendants claimed were shielded by the common interest privilege.  The second motion asserted that the attorney/client privilege did not apply to certain documents.  And the third motion challenged the sufficiency of responses to subpoenas served on City attorneys.  The district court denied all three motions.  It also denied Plaintiffs' motion to supplement the dispositive motion record

---

[5] Because we conclude that both Hedquist and HCI's retaliation claims against Patterson and Beamer fail, we need not consider the district court's rulings on qualified immunity regarding those defendants, including any issues raised in Beamer's cross-appeal.

with the transcript of the Rule 30(b)(6) deposition of the City of Casper, which was taken 53 days after the close of discovery.

"We review a district court's ruling denying a motion to compel for an abuse of discretion." *Norton v. The City of Marietta, OK*, 432 F.3d 1145, 1156 (10th Cir. 2005). "Under this standard, we will not disturb a trial court's decision absent a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotation omitted).

Plaintiffs contend that Defendants have "concealed" documents and information from Plaintiffs via the assertion of privilege. However, Plaintiffs have not provided any argument for how the district court abused its discretion in denying the motions. Their sweeping assertion that "the district court's reasoning was flawed," Aplt. Br. at 55, does not suffice. *Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007) (finding "cursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine"). Therefore, we affirm the district court's denial of the motions to compel and motion to supplement the dispositive motion record.

## VI.

For the reasons stated above, we AFFIRM the district court's summary judgment orders in favor of Defendants. We also AFFIRM the orders denying Plaintiffs' motions

to compel discovery and its order denying Plaintiffs' motion to supplement the

dispositive motion record.[6]


                                         Entered for the Court


                                         Allison H. Eid
                                         Circuit Judge

---

[6] On August 25, 2017, an order issued provisionally sealing 134 pages of Hedquist and HCI's appendix.  We now make that sealing permanent.